UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


NITTERHOUSE CONCRETE : 
PRODUCTS, INC., and NITTERHOUSE : 
MASONRY PRODUCTS, LLC, : 
 : 
        Plaintiffs : 
 :     CASE NO. 1:15-CV-2154
      v. : 
 :     (Judge Caldwell)
GLASS, MOLDERS, POTTERY, : 
PLASTICS & ALLIED WORKERS : 
INTERNATIONAL UNION, AFL-CIO, : 
CLC, and its LOCAL UNION 201B, : 
 : 
        Defendants : 


*M E M O R A N D U M*


I. *Introduction and Procedural History*

        Plaintiffs are Nitterhouse Concrete Products, Inc. ("NCP") and Nitterhouse

Masonry Products, LLC ("NMP"). Defendants are the Glass, Molders, Pottery, Plastics &

Allied Workers International Union, AFL-CIO, CLC and its Local Union 201B (hereinafter

"Defendants" or "Union"). Presently before the court are Plaintiffs' motion for summary

judgment (Doc. 35) and both parties' responses to this court's order (Doc. 50) giving notice

to Plaintiffs, pursuant to Federal Rule of Civil Procedure 56(f), of its intent to enter

summary judgment, <u>sua sponte</u>, in favor of Defendants on all claims.

        Plaintiffs filed this suit alleging that they each had a collective bargaining

agreement ("CBA") with the Union and that the Union breached the CBAs by failing to

indemnify Plaintiffs for withdrawal liability under the pension plan for Plaintiffs' employees

("the Plan").  Plaintiffs' complete withdrawal from the Plan followed the Union's decision to no longer represent Plaintiffs' employees after the expiration of the latest CBAs.

Plaintiffs make a breach-of-contract claim (Count I) and also seek a declaratory judgment (Count II) that the Union is obligated to indemnify or hold Plaintiffs harmless from Plaintiffs' withdrawal liability under the Plan.  Plaintiffs' claim is premised on language in the CBAs in which the Union "further agree[d] to indemnify and save harmless the Company from any claim or liability which may arise by reason of the existence of the Plan."  The Plan calculated NCP's withdrawal liability at $430,291, and NMP's withdrawal liability at $250,407.

The Union filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), making as its sole argument that it was not liable to indemnify Plaintiffs because any duty to indemnify did not survive the expiration of the CBAs.  By memorandum and order dated March 3, 2016, we denied that motion.  <u>Nitterhouse Concrete Prods., Inc. v. Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL-CIO, CLC</u>, No. 1:CV-15-2154, 2016 WL 827131, at *3 (M.D. Pa. Mar. 3, 2016); (Doc. 18).

As noted, Plaintiffs filed a motion for summary judgment, claiming they are entitled to indemnity from the Union for their withdrawal liability.  The Union opposes summary judgment, arguing there are genuine disputes of fact concerning the construction of the indemnity agreement, including whether the duty to indemnify survived the termination of the CBAs.  Furthermore, after ordering and receiving supplemental briefing on the issue of whether the obligation to indemnify survived the termination of the CBAs, we gave notice to Plaintiffs of our intent to enter summary judgment, <u>sua sponte</u>, in favor of Defendants on all claims.  (<u>See</u> Docs. 47, 50); Fed. R. Civ. P. 56(f)(1).  Both parties

have filed responses to our notice of intent to grant summary judgment in favor of Defendants, and the matter is ripe for disposition.

## II. Standard of Review

Federal Rule of Civil Procedure 56 governs the grant of summary judgment. The moving party is entitled to summary judgment if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (citation omitted).

In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The non-moving party cannot rest on mere pleadings or allegations," El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001).

## III. Procedural Issue Under Local Rule 56.1

We first address a procedural issue Plaintiffs raise. In accord with Middle District of Pennsylvania Local Rule 56.1, Plaintiffs filed a statement of material facts in numbered paragraphs. Local Rule 56.1 requires the non-moving party to respond to the numbered paragraphs and provides that any material facts in the moving party's statement

not objected to are deemed admitted.  In accord with the Rule, the Union filed a "Response" to Plaintiffs' statement of material facts corresponding to Plaintiffs' numbered paragraphs, either admitting those facts or contending there exists a genuine issue to be tried on certain facts.

But the Union did more than that.  As a continuation of its response to Plaintiffs' statement of material facts, it filed a "Statement of Additional Facts Material to Resolution of Plaintiffs' Motion" in numbered paragraphs, continuing with the numbering where Plaintiffs' numbered paragraphs left off.  (<u>See</u> Doc. 41 at ECF pp. 25-48).  The Union set forth ninety-four additional numbered paragraphs covering twenty-two pages.

Plaintiffs assert that the Local Rules do not provide for the non-moving party to file its own statement of material facts, and hence there is no requirement that they respond to the Union's additional facts under the risk of having them deemed admitted. Plaintiffs state they have nonetheless responded to the additional facts, sometimes admitting them, but have chosen to do so without the submission of additional evidence. Plaintiffs maintain that their choice not to submit additional evidence should not be taken as an admission that the additional facts are accurate.  They contend that the additional facts crucial to the Union's position are disputed and that none of them are material to a resolution of Plaintiffs' motion.  They further contend the Union's submission of additional facts is simply a way of submitting an additional twenty-two pages of briefing without having obtained approval to do so.

Although the Union's submission of additional facts does not precisely conform with Local Rule 56.1, the facts are supported by citations to the record, and hence the court believes it should take them into account if they are material.  The Union

certainly has the right to submit evidence material to a resolution of summary judgment. We further note that Plaintiffs have admitted many of the facts, so their decision not to submit additional evidence may not have any bearing on the resolution of summary judgment.

With this understanding, the following is the record for the purpose of Plaintiffs' motion for summary judgment and this court's notice of intent to enter summary judgment in favor of Defendants. The record is based on the parties' statements and counter-statements of material facts, along with the evidence submitted in support, as well as any additional evidence provided to support the responses to our notice of intent to enter summary judgment. We will also rely on evidence the Union brings to our attention by way of its statement of additional facts. We will sometimes borrow the parties' language without attribution. When we cite to only one party's statement, or counter-statement, of material facts, we do so because the other party has admitted the relevant facts.

## IV.   Background

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, was passed to regulate pension and welfare benefits plans. See M & G Polymers USA, LLC v. Tackett, 135 S. Ct. 926, 933 (2015). The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. §§ 1381-1461, was enacted to solve a funding problem ERISA had created for pension plans. Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co., 513 U.S. 414, 416-17 (1995). Prior to the passage of the MPPAA, ERISA only allowed a multiemployer plan to seek reimbursement for unfunded benefits from companies that had withdrawn from the plan within five years of

5

the plan becoming insolvent.  Id. at 416.  This sometimes encouraged a company to take its chances by withdrawing from a financially weak plan hoping that the company could outlast the five-year period for seeking reimbursement for unfunded benefits.  Id. at 416-17.  The MPPAA changed that by "provid[ing] that an employer who withdraws from an underfunded multiemployer pension plan must pay a charge sufficient to cover that employer's fair share of the plan's unfunded liabilities."  Id. at 415.

An employer completely withdraws from a plan when it "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan."  29 U.S.C. § 1383(a).  An "obligation to contribute," in turn, refers to an obligation arising "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor management relations law." Id. § 1392(a).  The Plan sponsor is responsible for determining and collecting withdrawal liability.  Id. § 1382.  Among other entities, a plan sponsor can include a board of trustees that establishes or maintains the plan.  Id. § 1002(16)(B).

Plaintiffs NCP and NMP are Pennsylvania corporations, with their principal offices located in Chambersburg, Pennsylvania.  (Doc. 36, Plaintiffs' Statement of Material Facts ("PSMF") ¶¶ 1 & 2)).  NCP and NMP are engaged in the business of selling pre-cast concrete products and concrete masonry products.  (Id. ¶ 4).  Defendant Union is a labor organization with its principal offices located in Media, Pennsylvania.  (Id. ¶ 3).

NCP and the Union initially entered into a collective bargaining agreement effective from February 16, 1970, through February 15, 1973 (the "1970 CBA").  (Id. ¶ 5). The 1970 CBA contained an Article XVII titled "Pensions," which stated in relevant part as follows:

> Section 1 – Pension Agreement. Effective February 14, 1972, the Company and the Union agree to participate in the Chesapeake-Penn Jersey Conference Board Pension Plan adopted as of April 1, 1965 by the Board of Trustees appointed for the purpose.
>
> * * * *
>
> Section 7 – Company Indemnification. The Company shall have no liability for the payment of benefits other than to make contributions to the Plan as above required.

(Id. ¶ 6; Doc. 36-1, ECF pp. 58-59, Pl.'s Ex. 2). The CBA between NCP and the Union effective from February 16, 1973, through February 15, 1976, (the "1973 CBA") contained identical provisions. (Doc. 36, PSMF ¶¶ 7 & 8).

NCP and the Union entered into a CBA effective from February 16, 1976, through February 15, 1979 (the "1976 CBA"). (Id. ¶ 9). Article XVII, Section 7 of the 1976 CBA was substantially changed from the 1970 and 1973 CBAs, and stated as follows:

> Section 17.07 – Company Indemnification. The Company shall have no liability for the payment of benefits other than to make contributions to the Plan as above required.
> The parties hereto recognize that, as between the Union, and the Company, the operation of the Pension is within the control of the Union. Therefore, the Union specifically agrees that the structure and operation of the Pension Plan shall comply with all laws applicable to it, including by way of example, and not limitation, the Employee Retirement Income Security Act of 1974, as amended from time to time and further agrees to indemnify and save harmless the Company from and [sic] claim or liability which may arise by reason of the existence of the Plan.

(Id. ¶ 11; Doc. 36-1, ECF pp. 78, Pl.'s Ex. 4).

NCP does not have specific knowledge as to how it came about that section 17.07 of the 1976 CBA was substantially modified to include much more detail on the Union's indemnification of NCP. (Doc. 36, PSMF ¶ 12). NCP's assumption is that its attorney recommended the language. (Id.) At the time, William Nitterhouse, NCP's CEO

and owner, would have been involved in the negotiation of the 1976 CBA.  (Id.)  NCP

followed the advice of its counsel in the CBA negotiations and would have relied on the

attorney's advice to recommend language to protect the company.  (Id.)  NCP "is almost

positive" that its attorney had a role in the new language included in section 17.07.  (Id.)

NCP believes its attorney recommended the additional language in section 17.07 to

protect NCP from current or future claims.  (Id. ¶ 15).

NCP and the Union entered into a CBA effective from February 16, 1979,

through February 15, 1982 (the "1979 CBA").  Article XVII, Section 7 of the 1979 CBA was

largely unchanged from the 1976 CBA, other than to correct an apparent typographical

error in the prior version where "and" was mistakenly used instead of "any":

> Section 17.07 – Company Indemnification.  The Company shall
> have no liability for the payment of benefits other than to make
> contributions to the Plan as above required.
> The parties hereto recognize that, as between the Union,
> and the Company, the operation of the Pension is within the
> control of the Union.  Therefore, the Union specifically agrees that
> the structure and operation of the Pension Plan shall comply with
> all laws applicable to it, including by way of example, and not
> limitation, the Employee Retirement Income Security Act of 1974,
> as amended from time to time and further agrees to indemnify
> and save harmless the Company from **any** claim or liability which
> may arise by reason of the existence of the Plan.

(Id. ¶¶ 16 & 17; Doc. 36-1, ECF p. 88, Pl.'s Ex. 5) (emphasis added).

NCP and the Union continued to enter into CBAs effective from February 16,

1982, through February 15, 2014 (the "1982-2014 CBAs").  (Doc. 36, PSMF ¶ 18).  The

language of Section 17.07 of the 1982 CBA was identical to Section 17.07 of the 1979

CBA.  (Id. ¶ 19).

The 1985 CBA contained the same language in section 17.07 that was

contained in the 1982 CBA except for the addition of a comma at the end of the phrase "as

amended from time to time." (Id. ¶ 20).  Thus, section 17.07 of the 1985 CBA read as follows:

> Section 17.07 – Company Indemnification – The Company shall have no liability for the payment of benefits other than to make contributions to the Plan as above required.
>
> The parties hereto recognize that, as between the Union, and the Company, the operation of the Pension is within the control of the Union.  Therefore, the Union specifically agrees that the structure and operation of the Pension Plan shall comply with all laws applicable to it, including by way of example, and not limitation, the Employee Retirement Income Security Act of 1974, as amended from time to time, and further agrees to indemnify and save harmless the Company from any claim or liability which may arise by reason of the existence of the Plan.

(Id.; Doc. 36-2, ECF pp. 21-22, Pl.'s Ex. 7) (emphasis added).

The 1988 to 2014 CBAs contained the same language in section 17.07 that was contained in the 1985 CBA.  (Doc. 36, PSMF ¶ 21).  Around 2003, NCP and NMP began to have separate CBAs with the Union.  (Id. ¶ 23; see also Defendant's response thereto).  The language of section 17.07 was identical for the NCP and NMP CBAs.  (Doc. 36, PSMF ¶ 24).

Of particular relevance for this case, NCP and the Union entered into a one-year CBA, effective from February 16, 2013, through February 15, 2014.  (Doc. 36-3, ECF pp. 47-55, Pl.'s Ex. 17) (containing relevant portions).  NMP and the Union also entered into an identical one-year CBA, effective from February 16, 2013, through February 15, 2014. (Doc. 36-3, ECF pp. 57-65, Pl. Ex. 18) (containing relevant portions).

On February 10, 2014, the Union sent NCP a Disclaimer of Interest letter, stating that upon expiration of NCP's 2013 CBA on February 15, 2014, the Union was disclaiming any interest in representing the employees of NCP and was ceasing representation of the employees of NCP as of February 15, 2014.  (Id. ¶ 25; Doc. 36-3,

ECF p. 67, Pl.'s Ex. 19).  On February 10, 2014, the Union also sent NMP a Disclaimer of

Interest letter, stating that upon expiration of NMP's 2013 CBA on February 15, 2014, the

Union was disclaiming any interest in representing the employees of NMP and was

ceasing representation of the employees of NMP as of February 15, 2014.  (Doc. 36,

PSMF ¶ 26; Doc. 36-3, ECF p. 69, Pl.'s Ex. 20).[1]

Both Plaintiffs have continued operations since February 15, 2014, and

maintain "they were effectively forced by the Union to withdraw from the Pension Plan as a

result of the Union's disclaimer of interest in representing employees of NCP and NMP

and decision not to enter into a new collective-bargaining agreement with NCP and NMP."

(Doc. 36, PSMF ¶ 27).  The Union agrees that Plaintiffs have continued operations, but

disputes that the Union's decision to no longer represent the workers "effectively forced"

Plaintiffs from the Plan.  (Doc. 41, Defendants' Statement of Material Facts ("DSMF")

¶ 27).

In support, the Union cites the deposition testimony of Mark Taylor, Plaintiffs'

designated representative.  Taylor testified that he did not check with the Plan to see if

Plaintiffs could continue to make contributions for their employees and continue to

participate pursuant to their participation agreement with the Plan.  Their impression was

that it was not an available option.  (Doc. 41-1, ECF p. 83, Taylor Dep.).

Some eighteen months later, on August 18, 2015, the Plan sent letters to

each Plaintiff, notifying them of the assessment of withdrawal liability owing to the Plan.

(Doc. 36, PSMF ¶¶ 28 & 29).  The Plan claimed Plaintiffs had ceased operations resulting

in a withdrawal from the Plan and thereby incurred withdrawal liability under Section 4201

---

[1] The 2013 CBAs had provided that they would continue until midnight on February 15, 2014, and would automatically renew from year to year thereafter unless written notice was given.  (Doc. 36-3, ECF pp. 54 & 64).

of ERISA, 29 U.S.C. § 1381.  (Id. ¶ 30; Doc. 36-3, ECF pp. 71, 77).  These letters from the Plan were incorrect insofar as Plaintiffs had not ceased operations.  (Doc. 36, PSMF ¶ 27). The Plan assessed NCP's withdrawal liability at $430,291 and NMP's withdrawal liability at $250,407, payable in a lump sum or quarterly.  (Id. ¶¶ 31 & 32).

On September 25, 2015, NCP made its first quarterly payment to the Plan of $12,900.27.  (Id. ¶ 34).  On September 25, 2015, NMP made its first quarterly payment to the Plan of $9,806.70.  (Id. ¶ 35).  On October 13, 2015, Plaintiffs sent letters to the Union demanding reimbursement for these payments, and further demanding that the Union indemnify and hold Plaintiffs harmless for their continuing withdrawal liability to the Plan. (Id. ¶ 41).  The Union has rejected those demands and denies that it has an obligation to indemnify Plaintiffs for withdrawal liability.  (Id. ¶¶ 42 & 43).

On December 8, 2008, approximately five years before the Union's disclaimer of interest letters, an NCP employee, Todd R. Mumma, filed with the National Labor Relations Board ("NLRB") a petition for an election to decertify the Union as the collective bargaining representative of NCP employees.  (Doc. 41, DSMF ¶ 79).  Plaintiffs had believed that decertification of the Union would terminate their bargaining relationship with the Union, causing Plaintiffs to withdraw from the Pension Plan.  (Id. ¶ 80 & Plaintiffs' response thereto).

Pursuant to Mumma's decertification petition, the NLRB held a decertification election at NCP on January 16, 2009.  (Doc. 41, DSMF ¶ 85).  A majority of participants in that election voted to retain the Union as the collective bargaining representative of NCP employees.  (Id. ¶ 86).  After 2008, Plaintiffs began to request their estimated withdrawal liability from the Pension Plan "fairly regularly."  (Id. ¶ 87).

Plaintiffs and the Union began negotiating successor collective bargaining agreements—to follow the 2012 CBAs that expired on February 15, 2013—on January 15, 2013.  (Id. ¶ 107).  Consistent with the parties' past practice, NCP and NMP negotiated separately with the Union.  (Id. ¶ 108).

On January 15, 2013, NCP and NMP transmitted to the Union a first set of written proposals.  Among other matters, the documents proposed amending section 17.08 of the existing CBA to include the following underscored text:

### Section 17.08 – Duration of Pension Plan

The Pension Plan, including the rates of required contributions, shall remain in full force and effect without change or modification for the term of this Agreement, subject only to amendment by action of the Board of Trustees.  No changes or alterations shall be made herein except by mutual agreement of the parties.  The rights to receive benefits under the Pension Plan and the associated responsibilities of the Union as described in the provisions of ARTICLE XVII shall not be affected by the termination of this agreement.

(Id. ¶¶ 110 & 111) (underscoring in original).  Later drafts of this proposal with subtle variations were sent to the Union, (id. ¶¶ 114, 117, 122), but the underlined language remained essentially the same, (id. ¶¶ 114, 117, 122).  This proposed amendment, regarding the "responsibilities of the Union as described in the provisions of ARTICLE XVII" not being "affected by the termination of this agreement," was rejected every time by the Union.  (Id. ¶¶ 113, 115, 118, 123).

Plaintiffs' counsel and lead negotiator testified that this proposal, which he had drafted, with its reference to "the associated responsibilities of the Union as described in the provisions of ARTICLE XVII," covered anything related to the pension in Article XVII, and was broader than just the indemnification obligation.  (Id. ¶ 129; Doc. 41-2, ECF pp.

18-19, Jackson Dep.).  Plaintiffs' corporate representative testified that section 17.07

describes "the associated responsibilities of the Union as described in the provisions of

ARTICLE XVII."  (Doc. 41, DSMF ¶ 130).

Plaintiffs' corporate representative also testified that NCP and NMP

proposed amending section 17.08 for the purpose of "trying to get something in the

contract . . . that we could share with our employees about their pension rights" that would

reassure them that their vested rights to receive a pension would not be affected by the

termination of the collective bargaining agreements.  (Id. ¶ 134 (citing Doc. 41-1, ECF pp.

36-37, Taylor Dep.)).  Three NCP employees had purported concerns about their

pensions.  (Id. ¶ 137).  One of these employees was Mumma.  (Id. ¶ 138).  Mumma

testified that he knew his pension money would not be lost, but he was concerned there

would be no gain.  (Id.; Doc. 41-2, ECF pp. 44-45, Mumma Dep.).  NCP has about 150

employees, and NMP has about 70 employees.  (Doc. 41, DSMF ¶ 140).[2]

In a letter Plaintiffs' counsel transmitted to the Union on January 31, 2013,

Plaintiffs withdrew their proposed amendment to Section 17.08.  (Id. ¶ 143; Doc. 41-3,

ECF pp. 36-39, Def's Ex. 21).  The parties ultimately executed collective bargaining

agreements (that would be effective February 16, 2013, and expire on February 15, 2014)

that omitted the proposed additional language for section 17.08.  (Doc. 41, DSMF ¶ 144).

Thus, section 17.08 of the final executed collective bargaining agreements for both NCP

and NMP read:

---

[2] In a letter dated January 31, 2013, Plaintiffs sought the Union's assistance in "creat[ing] a
mutually agreeable written summary that can be shared with employees and that addresses the
tangible concern that has been raised with Company officials" concerning the security of vested
pension benefits.  (Doc. 41, DSMF ¶ 145; Doc. 41-3, ECF pp. 36, 39, Def.'s Ex. 21).  Plaintiffs
never distributed to their employees any communication (joint or otherwise) of the type that they
referred to in this letter.  (Doc. 41, DSMF ¶ 146).

**Section 17.08 – Duration of Pension Plan**

The Pension Plan, including the rates of required contributions, shall remain in full force and effect without change or modification for the term of this Agreement, subject only to amendment by action of the Board of Trustees. No changes or alterations shall be made herein except by mutual agreement of the parties.

(Doc. 41, DSMF ¶ 144; Doc. 36-3, ECF pp. 52-53, 63, Pl.'s Ex. 17 & 18).

*V. Discussion*

A. Scope of the Indemnity Agreement

In moving for summary judgment, Plaintiffs assert that the indemnity agreement plainly requires the Union to indemnify them for their withdrawal liability, regardless of when that withdrawal liability was incurred. The Union responds that the indemnity provision is ambiguous and that a fact finder should determine whether it applies to withdrawal liability.

We do not agree with either party's position. Instead, we find that the plain language of the indemnification provision is broad enough to encompass MPPAA withdrawal liability, but also find that the scope of the indemnification agreement is only one half of a two-part issue.

Collective bargaining agreements are interpreted "according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." M & G Polymers USA, LLC v. Tackett, 135 S. Ct. 926, 933 (2015). "In this endeavor, as with any other contract, the parties' intentions control." Id. (citation omitted). "'Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.'" Id. (citation omitted).

As a preliminary matter, the court must determine whether written contract terms are clear or ambiguous.  Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 587 (3d Cir. 2009).  "A contract clause is ambiguous when it is subject to reasonable alternative interpretations."  UAW v. Skinner Engine Co., 188 F.3d 130, 142 (3d Cir. 1999) (citation and internal quotation marks omitted).

"To determine whether a contract is ambiguous, a court may not merely consider whether the language is clear from its point of view."  Id.  Instead, the court must "hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings."  In re Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993) (alteration in original) (citation omitted). "Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation."  Id.  "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.  These basic principles of contract construction are not inconsistent with federal labor policy."  Id.

We set forth the indemnity provision at issue, which is identical in both NCP's and NMP's final collective bargaining agreement with the Union.

### Section 17.07 – Company Indemnification

The Company shall have no liability for the payment of benefits other than to make contributions to the Plan as above required.

The parties hereto recognize that, as between the Union, and the Company, the operation of the Pension is within the control of the Union.  Therefore, the Union specifically agrees that

> the structure and operation of the Pension Plan shall comply with all laws applicable to it, including by way of example, and not limitation, the Employee Retirement Income Security Act of 1974, as amended from time to time, *and further agrees to indemnify and save harmless the Company from any claim or liability which may arise by reason of the existence of the Plan.*

(Doc. 36-3, ECF pp. 52 & 63, Pl.'s Ex. 17 & 18) (emphasis added).

### 1. Plaintiffs' Interpretation of the Indemnity Provision

Plaintiffs assert that the meaning of the indemnity provision is plain and unambiguous. In their view, we need only concern ourselves with the last clause in the provision, where the Union "agrees to indemnify and save harmless the Company from any claim or liability which may arise by reason of the existence of the Plan." (Doc. 37, Pls.' Br. in Supp. of Summ. J. at ECF p. 14). Plaintiffs contend this clause represents an independent obligation on the part of the Union to indemnify Plaintiffs, and more specifically here, to indemnify Plaintiffs for their withdrawal liability.

With the focus on this clause, Plaintiffs first point out that the word "any" has an expansive meaning, citing the following cases. In United States v. Gonzales, 520 U.S. 1, 5 (1997), in interpreting a criminal statute containing the phrase "with any other term of imprisonment," the Supreme Court stated, "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind,'" citing Webster's Third New International Dictionary. The Supreme Court's approach to "any" was quoted and followed in Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Kempthorne, 497 F.3d 337, 352 (3d Cir. 2007), involving an environmental regulation containing the phrase "any areas which may be in default at any time." Plaintiffs also direct our attention to Boyle v. United States, 556 U.S. 938, 944 (2009) (the use of the term "any" in the RICO statute ensures that the definition of included enterprises has a

16

wide reach), and <u>Adhesives Research Inc. v. Am. Inks & Coatings Corp.</u>, 931 F. Supp. 1231, 1239 (M.D. Pa. 1996) ("The court finds no reason to give the phrase 'any other person' other than its plain meaning.  While the phrase may be expansive, its meaning is not unclear.").

Plaintiffs next argue that their withdrawal liability arises by reason of the existence of the Plan because their withdrawal liability is based on their status as contributing employers under the Plan and because their withdrawal liability is calculated under Article XII of the Plan.  (<u>See</u> Doc. 36-4, ECF pp. 2 & 75).  For Plaintiffs, it follows that their claim for indemnification for withdrawal liability falls within the phrase "any claim or liability which may arise by reason of the existence of the Plan."

As a further argument that the Union agreed to indemnify Plaintiffs for withdrawal liability, Plaintiffs point to the first sentence of section 17.07, which provides that "[t]he Company shall have no liability for the payment of benefits other than to make contributions to the Plan as above required."  (Doc. 36-3, ECF pp. 52 & 63, Pl.'s Ex. 17 & 18).  As Plaintiffs contend, withdrawal liability is statutorily imposed so that the withdrawing employer pays its share of the Plan's unfunded liability.  <u>Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Engineers, Local Union No. 66</u>, 580 F.3d 185, 194 (3d Cir. 2009).  The unfunded liability is based on the amount of benefits that must be paid out under the terms of the Plan.  <u>See</u> 29 U.S.C. § 1391.  Plaintiffs assert that the withdrawal liability is thus essentially used to pay additional benefits beyond those supported by Plaintiffs' previous contributions.  Yet under the first sentence of section 17.07, Plaintiffs have no liability to pay benefits, only to make contributions to the Plan.  Plaintiffs maintain that it therefore makes sense for the Union to indemnify Plaintiffs for what are essentially

payments of future benefits since Plaintiffs only obligated themselves to make contributions and were not liable for the payment of benefits.

Plaintiffs understand there is other language in section 17.07, but parses the language in the following way to conclude that the only language relevant is the very last clause of section 17.07. Plaintiffs argue that when the 1985 CBA added a comma at the end of the phrase "as amended from time to time," it made the last clause of section 17.07 an independent obligation to indemnify Plaintiffs, regardless of the language that precedes it. As Plaintiffs maintain, with numbering added in their brief:

> Since 1985, the second sentence of the second paragraph of Section 17.07 contains two separate agreements separated by a comma:
>> (1) "the Union specifically agrees that the structure and operation of the Pension Plan shall comply with all laws applicable to it, including by way of example, and not limitation, the Employee Retirement Income Security Act of 1974, as amended from time to time,"
>>
>> (2) "and further agrees to indemnify and save harmless the Company from any claim or liability which may arise by reason of the existence of the Plan."

(Doc. 37, Pls.' Br. in Supp. of Summ. J. at ECF pp. 18-19).

### 2. The Union's Interpretation of the Indemnity Provision

Not surprisingly, the Union offers a different interpretation. It points out that Plaintiffs' interpretation ignores much of the language in the provision, when all of the language must be taken into account. The Union contends that, properly understood, and considering all of the language, the indemnification provision "is better read as limited to liabilities related to those elements of the Plan's structure and operation potentially under Defendant's control." (Doc. 40, Def.'s Br. in Opp'n to Summ. J. at ECF p. 21). The

provision was not intended "to cover liabilities unrelated to Defendant's control over the structure and operation of the Plan." (Id.)

The Union points to other language in section 17.07. That language, a separate paragraph consisting of two sentences, is:

> The parties hereto recognize that, as between the Union, and the Company, the operation of the Pension is within the control of the Union. Therefore, the Union specifically agrees that the structure and operation of the Pension Plan shall comply with all laws applicable to it, including by way of example, and not limitation, the Employee Retirement Income Security Act of 1974, as amended from time to time, and further agrees to indemnify and save harmless the Company from any claim or liability which may arise by reason of the existence of the Plan.

(Doc. 36-3, ECF p. 52, Ex. 17).

The Union argues that Plaintiffs' interpretation ignores the conjunctive adverb "therefore," which the Union maintains is a violation of the canon of construction that each provision or term should be given effect. "Therefore" creates, as the Union puts it, a "causal relationship between the two sentences" in the paragraph and limits or ties the Union's obligation to indemnify Plaintiffs to "the scope of its control over the Plan—that is, to control that could be exercised to allow the Plan to adopt an unlawful structure or to operate unlawfully." (Doc. 40, Def.'s Br. in Opp'n to Summ. J. at ECF p. 23).

The Union contends that "therefore" operates the same way for the second clause of the second sentence as it does for the first clause because of the "parallelism" between "specifically agrees" and "further agrees"; that is, just as "therefore" ties the Union's promise in the first sentence to the Union's control, so also "therefore" ties the Union's obligation to indemnify Plaintiffs to activities of the Plan the Union controls. (Id. at ECF pp. 23-24).

19

In this regard, the Union disagrees with Plaintiffs' reliance on the 1985 addition of a comma after the phrase "as amended from time to time." The Union argues in part that the addition of the comma merely sets off the parenthetical phrase "as amended from time to time," and does not operate to transform the last clause of the paragraph into an indemnity agreement independent from the rest of the sentence.

The Union further argues that "it is certainly reasonable to limit the scope of Defendant's indemnification obligation to those claims and liabilities related to the structure and operation of the Plan that Defendant controlled or could control." (Id. at ECF pp. 24-25). It follows for the Union that it owes no duty to indemnify Plaintiffs for their withdrawal liability because there are no facts in the record indicating that the Union "had any control over the Plan's structure and operation, let alone over its assessment of withdrawal liability against Plaintiffs." (Id. at ECF p. 25). The Union asserts it had no role in that assessment, citing its own statement of material facts, (Doc. 41, DSMF ¶ 156), and maintains that such control was statutorily vested in the Plan's Trustees, citing 29 U.S.C. §§ 1002(16)(B) and 1382.

As further support for its interpretation of the indemnity provision, the Union argues that the circumstances existing at the time of negotiations indicate that the parties did not intend for the provision to encompass withdrawal liability. In doing so, the Union observes that withdrawal liability did not exist either at the time the indemnity clause was drafted or when it was later changed.

Elaborating, the Union notes that the indemnity provision, as originally adopted by the parties in 1970 (in other words, the agreement consisting solely of the first sentence of section 17.07), only protected Plaintiffs from liability for the payment of

benefits, limiting Plaintiffs' obligation only to the payment of contributions to the Plan.  After the passage of ERISA in 1974, the 1976 CBA was substantially changed from the 1973 CBA to include a reference to ERISA, indicating for the Union that indemnification was to apply only to risks related to the enactment of ERISA.  Further, the Union argues that Plaintiffs are simply wrong in equating withdrawal liability to the payment of benefits.  The Union argues in part that one difference is that withdrawal liability is not payable to employees but instead directly to the Plan to cover the Plan's unfunded liabilities.

The Union also contends that the Plaintiffs' interpretation, because it broadly asserts the right to indemnity for "any claim or liability which may arise by reason of the existence of the Plan," runs counter to two principles of contract construction.  First, there is the principle of contract construction that precludes indemnity for intentional or reckless acts, citing RESTATEMENT (SECOND) OF CONTRACTS § 195(1) (Am. Law Inst. 1981).  Second, there is the principle that, while indemnification for a party's own negligence is permitted, such an indemnity provision must be "construed strictly" and state "the intention of the parties with the greatest particularity."  For this second principle, the Union cites Valhal Corp. v. Sullivan Assocs., Inc., 44 F.3d 195, 202 (3d Cir. 1995).

Additionally, the Union says that because Plaintiffs construe the clause as encompassing indemnity for "all manner of liabilities," (Doc. 40, Def.'s Br. in Opp'n to Summ. J. at ECF p. 28), the clause violates a rule of construction that prefers an interpretation that gives a lawful meaning to all the terms and does not leave one part unlawful.  Here the Union cites in part RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (Am. Law Inst. 1981).  It follows for the Union that "'any claim or liability' cannot be the

literal scope of the indemnification provision; rather, the parties must have intended it to be narrower." (Doc. 40, Def.'s Br. in Opp'n to Summ. J. at ECF p. 29).

The Union elaborates on this argument by contending that "clear and unequivocal language" should be present in the agreement requiring indemnification for Plaintiffs' withdrawal liability before we impose such liability on the Union. The Union bases this argument on the principle of contract construction "that if parties intend to include within the scope of their indemnity agreement a provision that covers losses due to the indemnitee's own negligence, they must do so in clear and unequivocal language." Ruzzi v. Butler Petroleum Co., 588 A.2d 1, 4 (Pa. 1991). "No inference from words of general import can establish such indemnification." Id.

As the Union explains, this "clear and unequivocal language" requirement has been extended by the Third Circuit to an agreement to indemnify another for his contractual liability to a third party, reasoning that "the policy underlying the . . . doctrine applies with equal force to" such indemnification. Jacobs Constructors, Inc. v. NPS Energy Servs., Inc., 264 F.3d 365, 372 (3d Cir. 2001). It has also been extended by the Texas Supreme Court to agreements to indemnify for strict statutory liability. Houston Lighting & Power Co. v. Atchison, Topeka & Santa Fe Ry. Co., 890 S.W.2d 455, 458 (Tex. 1994). In part, the Texas Supreme Court cited the following reasons: (1) without such a clear rule a party may not be on notice of its potential liability; (2) agreements to indemnify for strict statutory liability "involve an extraordinary shifting of the risk"; and (3) such agreements "may have great financial impact on the parties." Id.

The Union posits that this reasoning means the "clear and unequivocal language" requirement should also apply to agreements to indemnify for withdrawal

liability.  Similar to the liabilities referenced in the above cases, "[w]ithdrawal liability is a statutory liability for which Defendant is not at fault" and "indemnification creates the risk of shifting 'tremendous costs' and 'great financial impact' without clear notice."  (Doc. 40, Def.'s Br. in Opp'n to Summ. J. at ECF p. 31).

The Union therefore argues the expansive language in the instant indemnity clause should not be read to include withdrawal liability.  The Union adds that Plaintiffs admit they drafted the pertinent language, and the general rule is that language should be interpreted against the drafter, citing in part RESTATEMENT (SECOND) OF CONTRACTS § 195 cmt. b (Am. Law Inst. 1981).

In reply, Plaintiffs first argue that the Union has not shown that the phrase "any claim or liability which may arise by reason of the existence of the Plan" is ambiguous or susceptible to different interpretations.  Instead, the Union is attempting to rewrite the phrase or limit it, but a court cannot rewrite a contract to assist an unhappy party.  See Brisbin v. Superior Valve Co., 398 F.3d 279, 290 (3d Cir. 2005) ("[I]t is axiomatic that a court may not rewrite the clear provisions of a contract to make it more reasonable or to protect a party against an unwelcome result.").

Second, Plaintiffs argue that the Union has presented no evidence that a fact finder would have to evaluate to determine the meaning of the indemnity agreement.  Thus the court is still left with making the decision on the scope of the agreement.

Third, Plaintiffs argue that, even if the Union's interpretation were accepted, the Union would still have to indemnify Plaintiffs for their withdrawal liability.  This is so because the Union interprets the indemnity provision to apply only to claims or liabilities related to the Plan's structure and operation that the Union controls.  But withdrawal

liability is related to the Plan's structure and operation that the Union controls because the Union controlled the operation of the Plan by the amount of benefits it decided to pay employees. A decision on the amount of benefits to distribute is relevant to withdrawal liability because it affects the amount of assets the Plan has, assets that are used in the calculation of withdrawal liability. <u>See</u> <u>Pension Benefit Guar. Corp. v. R.A. Gray & Co.</u>, 467 U.S. 717, 725 (1984) ("This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." (citing 29 U.S.C. §§ 1381, 1391)).

According to Plaintiffs, the Union failed in its operation of the Plan because the amount of benefits it agreed to pay exceeded the assets, resulting in unfunded vested benefits and withdrawal liability. Plaintiffs assert that in these circumstances, it is reasonable for them to expect indemnity from the Union for a liability that resulted from the Union's control of the Plan.

Fourth, Plaintiffs contend that it is irrelevant whether, as the Union maintains, there is no factual basis for the Union's control over the Plan's structure and operation because the Union agreed in the CBAs that "the operation of the Pension" was "within the control of the Union." Further, the Union agreed with this statement for thirty-eight years in the CBAs, and it should not now be allowed to claim the statement is false. Estoppel should apply to prevent that. Further, Plaintiffs have presented evidence that the Union controlled the Plan: the Union's president was the Chairman of the Plan's board of trustees at the time Plaintiffs withdrew from the Plan.

Fifth, Plaintiffs concede that withdrawal liability did not exist in 1976 when the indemnity agreement was first included in section 17.07.  But this does not mean, as the Union argues, that the parties did not intend to include withdrawal liability in the indemnity provision.  Withdrawal liability existed as early as 1980, and the Union agreed from 1982 through 2014 to the same indemnification language, after withdrawal liability became a possibility in connection with the existence of the Plan.  Plaintiffs argue that the indemnity language should be construed consistent with the circumstances at the time each CBA was adopted, not just in 1976.

Sixth, Plaintiffs reject the Union's reliance on cases requiring "clear and unequivocal language" indemnifying for a third party's negligence or other liability before indemnification can be imposed.  Plaintiffs contend there is no equivalence between withdrawal liability and the type of conduct that calls for "clear and unequivocal language" before indemnification will be permitted.  Plaintiffs point out that withdrawal liability was imposed on them through no culpable conduct of their own and argue "if anyone is culpable, it is the Union who controlled the Pension Plan and made decisions that resulted in the unfunded vested benefits."  (Doc. 43, Pls.' Reply Br. at ECF p. 8).

*3.  The Scope of the Indemnity Agreement*

For the following reasons, we agree with Plaintiffs that the Union has failed to establish that the language in the indemnification provision is ambiguous.  As Plaintiffs correctly assert, just because the provision's language casts a broad net does not make it "susceptible to different meanings."

We first reject the Union's argument that it is reasonable to limit the scope of its indemnification obligation to those claims and liabilities related to the structure and

operation of the Plan that Defendant in fact controlled or could control. We likewise reject the Union's related factual argument that it has no liability because there is nothing in the record indicating that the Union "had any control over the Plan's structure and operation, let alone over its assessment of withdrawal liability against Plaintiffs."

The indemnity agreement states, "The parties hereto recognize that, as between the Union, and the Company, the operation of the Pension is within the control of the Union."  (Doc. 36-3, ECF pp. 52 & 63, Pl.'s Ex. 17 & 18).  Based on this premise, it then provides, in pertinent part, that "the Union specifically agrees that the structure and operation of the Pension Plan shall comply with all laws applicable to it . . . ."  (Id.)  We agree with Plaintiffs that, under this language, it is irrelevant whether the Union in fact had control over the Plan's structure and operation.  That is because by this language the Union agreed—at least as between it and Plaintiffs—that it did have control.  Thus, any factual issues concerning the Union's actual control of the Plan, or its responsibility for assessment of withdrawal liability, are irrelevant due to the language of the indemnification provision.

We also reject the Union's argument—based on the circumstances when the indemnity provision was adopted both originally in its one-sentence format and when it was modified in 1976 after passage of ERISA—that the provision was not intended to encompass withdrawal liability.  The Union argues the original agreement only protected Plaintiffs from liability for the payment of benefits, limiting Plaintiffs' obligation only to the payment of contributions to the Plan.  The Union also argues that the 1976 change in the CBA to include a reference to ERISA indicates that indemnification was to apply only to

risks related to the enactment of ERISA.  The Union also observes that withdrawal liability did not exist at either time, only arising after the passage of the MPPAA in 1980.

As Plaintiffs correctly point out, however, although withdrawal liability did not exist in 1976 when the indemnity agreement was first included in section 17.07, withdrawal liability did exist in 1982 and thereafter.  And the Union agreed, from 1982 through 2014, to the same indemnification language even after withdrawal liability became a distinct possibility in connection with the existence of the Plan.  We conclude that the indemnity language should be construed consistent with the circumstances present at the time the CBAs were entered into, not just in 1976.  Consequently, the subject language certainly could have contemplated withdrawal liability when the Union withdrew its representation of Plaintiffs' workers in February 2014.

We next reject the Union's arguments relying on the following principles of contract construction: (1) indemnity is precluded for intentional or reckless acts; (2) indemnity for one's own negligence is permissible but the provision must state the intention of the parties with the greatest particularity; (3) an interpretation is preferred that gives a lawful meaning to all the terms and does not leave one part unlawful.  The Union says this is not a matter of defense to a particular claim but one of contract interpretation rendering invalid Plaintiffs' overly broad interpretation that "any claim or liability" is covered.

We find that there is no equivalence between withdrawal liability and the type of conduct that calls for "clear and unequivocal language" before indemnification will be permitted.  Plaintiffs point out that withdrawal liability was imposed on them because the

Union disclaimed interest in representing Plaintiffs' workers.[3]  We further observe that in two of the cases the Union has cited, <u>Ruzzi</u> and <u>Houston Lighting</u>, <u>supra</u>, the rule was imposed in light of the indemnitee's attempt to transfer liability for its own culpable or negligent conduct.  The third case, <u>Jacobs</u>, <u>supra</u>, is distinguishable because it involved a general contractor's attempt to transfer liability for its contractual indemnity to a principal to a subcontractor by way of the latter's agreement to indemnify the general contractor.

The Union also generally argues that the indemnity provision should be construed against Plaintiffs, as NCP and NMP were the drafters of the agreement.  The rule of "contra proferentem," however, is a principle of contract construction that should be relied upon only as a matter of last resort.  <u>See</u> 11 Richard A. Lord, <u>Williston on Contracts</u> § 32:12 (4th ed.); <u>Opalinski v. Robert Half Int'l Inc.</u>, 677 F. App'x 738, 744 (3d Cir. 2017) (nonprecedential).

We also note that we disagree with one particular argument made by Plaintiffs.  Plaintiffs rely on the first sentence of section 17.07, which provides: "The Company shall have no liability for the payment of benefits other than to make contributions to the Plan as above required."  As Plaintiffs argue, withdrawal liability is essentially used to pay additional benefits beyond those supported by Plaintiffs' previous contributions.  Yet under the first sentence of section 17.07, Plaintiffs had no liability to pay benefits, only to make contributions to the Plan.  Plaintiffs maintain that it therefore makes sense for the Union to indemnify Plaintiffs for what are essentially payments of future benefits since Plaintiffs only obligated themselves to make contributions and were not

---

[3] The Union asserts that Plaintiffs could have made voluntary contributions to the Plan, and so need not have withdrawn.  The Union, however, provides no evidentiary support for this contention, and it appears to contradict the relevant statutory provisions.  <u>See</u> 29 U.S.C. §§ 1383(a)(1), 1392(a).

liable for the payment of benefits.  We disagree because, as the Union correctly argues, withdrawal liability is not payable to Plaintiffs' employees, as benefits would be, but to the Plan, tied to the Plan's unfunded estimated liabilities.  In short, paying withdrawal liability is not the same as paying benefits.

Nonetheless, we ultimately agree with Plaintiffs that "any claim or liability which may arise by reason of the existence of the Plan" is broad enough to include withdrawal liability under the MPPAA.  Despite the Union's best efforts to manufacture an ambiguity or to read limiting language into this clause, we find that the plain language of the indemnification provision is clear and unambiguous insofar as withdrawal liability is a type of "claim or liability" that "may arise by reason of the existence of the Plan."  Indeed, "[w]hile the phrase may be expansive, its meaning is not unclear." Adhesives Research Inc. v. Am. Inks & Coatings Corp., 931 F. Supp. 1231, 1239 (M.D. Pa. 1996).  As such, we find that even though the indemnification provision does not specifically mention MPPAA withdrawal liability, such liability is included in the expansive language of this particular contract provision.

This first conclusion, however, leads us to the Union's next main argument. The Union contends that even if withdrawal liability were contemplated by the indemnification provision, such an obligation to indemnify for withdrawal liability did not survive the expiration of the final CBAs.

As noted, we ordered the parties to provide supplemental briefing on this issue.  In pertinent part, our order stated:

> The parties shall provide further briefing to the court, **limited to the following issue**:

Assuming that MPPAA withdrawal liability is included in the phrase "any claim or liability which may arise by reason of the existence of the Plan" contained in section 17.07 of the collective bargaining agreement (CBA), and considering the general principle that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement," M & G Polymers USA, LLC v. Tackett, 135 S. Ct. 926, 937 (2015) (citation omitted), whether the instant agreement to indemnify for withdrawal liability survives the expiration of the CBA.   In particular, the parties should address when withdrawal liability accrued, when the "facts and occurrences" surrounding withdrawal liability arose, Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 205-06 (1991), as well as any other reason related to contract-interpretation principles why the contractual right to indemnification for withdrawal liability survives, or does not survive, expiration of the CBA.

(Doc. 47 at 1).  Both parties provided excellent briefing in response.

B.  Survival of Obligation to Indemnify After Expiration of Final CBAs

The Union argues that Plaintiffs cannot seek indemnity from the Union for withdrawal liability regardless of the scope of the indemnity provision.  According to the Union, this is because—under the general rule that contractual obligations cease upon termination of the bargaining agreement—the Union's contractual obligation to indemnify ceased when the final CBAs expired on February 15, 2014; Plaintiffs' withdrawal liability, on the other hand, only arose after the CBAs had terminated.

*1.  Preliminary Arguments and Clarifications*

Before getting into the merits of this second issue, we first deal with Plaintiffs' contention that the law of the case prohibits the Union from arguing again that its duty to indemnify does not survive the termination of the CBAs.  As noted above, the Union filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), making as its sole argument that it was not liable to indemnify Plaintiffs because any duty to indemnify did not survive the expiration of the CBAs.  By memorandum and order dated March 3, 2016, we

denied that motion.  <u>Nitterhouse Concrete Prods., Inc. v. Glass, Molders, Pottery, Plastics</u> <u>& Allied Workers Int'l Union, AFL-CIO, CLC</u>, No. 1:CV-15-2154, 2016 WL 827131, at *3 (M.D. Pa. Mar. 3, 2016).

Plaintiffs recognize there are different standards that apply to a motion to dismiss and a motion for summary judgment, but maintain that our ruling at the motion-to-dismiss stage applies equally here.  It is therefore the law of the case, and the Union should not be allowed argue that the issue turns on a factual basis when before it argued it was a legal issue.

We disagree.  There is nothing inconsistent about arguing law at the motion-to-dismiss stage and then arguing evidence at the summary judgment stage.  Indeed, the two stages are set up so that law is argued at the former stage and evidence argued at the latter.  The law of the case does not preclude the Union from making its argument again at summary judgment, especially after discovery has been completed and supporting evidence has been submitted.  <u>See</u> <u>Corliss v. Varner</u>, 247 F. App'x 353, 354 (3d Cir. 2007) (nonprecedential) (law-of-the-case doctrine does not apply "where the legally relevant factors differ" between a motion to dismiss and a motion for summary judgment).

The Union also questions our statement when we ruled on the motion to dismiss that "[w]ithdrawal liability could only occur after the CBAs expired . . . ." <u>Nitterhouse Concrete Prods.</u>, 2016 WL 827131, at *3.  The Union points out that withdrawal liability can also occur even when a CBA does not expire.  It can occur when an employer "permanently ceases all covered operations under the plan."  29 U.S.C. § 1383(a)(2).  According to the Union, this "can occur even though an employer remains signatory to a collective-bargaining agreement requiring contributions to the plan," citing

Speckman v. Barford Chevrolet Co., 535 F. Supp. 488, 491 (E.D. Mo. 1982).  Withdrawal liability can also occur when "an employer is expelled from a plan for failure to make required contributions," even though the CBA continues to exist, citing In re Hostess Brand, Inc., 499 B.R. 406, 408, 410 (S.D.N.Y. 2013).  Finally, the Union asserts that withdrawal liability could occur without expiration of the CBA if an employer was obligated to contribute to a plan during one CBA but was no longer required to do so during a successor CBA.

Plaintiffs respond that these are unique situations, and none of them applies to the instant case.  Rather, Plaintiffs maintain that "it is accurate to state that withdrawal liability would normally only occur after expiration of the CBAs, absent some conduct by Plaintiffs in breach of the CBAs that caused an earlier withdraw[al] from the Plan."  (Doc. 43, Pls.' Reply Br. at ECF p. 11 n.1).

We agree with the Union and are constrained to walk back our previous dicta implying that withdrawal liability could only occur after expiration of the CBAs, inasmuch as that statement had any broader implication beyond the particular facts of this case.  As the Union has demonstrated, there are multiple circumstances where withdrawal liability could be incurred while a CBA is still in effect, most notably when there is a "complete withdrawal" because an employer "permanently ceases all covered operations under the plan."  29 U.S.C. § 1383(a)(2).

We further note that this is not an insignificant correction, because otherwise the instant indemnification provision could appear "nugatory" or meaningless, thus counseling against the Union's proffered interpretation.  See CTF Hotel Holdings, Inc. v. Marriot Int'l, Inc., 381 F.3d 131, 137 (3d Cir. 2004) (citation omitted); 11 Richard A. Lord,

Williston on Contracts § 32:11 (4th ed.).  That is, if withdrawal liability could only occur after expiration of the CBAs, and the Union's proffered interpretation is that the indemnification provision does not survive the expiration of the CBAs, the indemnification provision would be rendered meaningless (at least as to withdrawal liability).  But, as Defendants have shown, because withdrawal liability could be incurred during the existence of a collective bargaining agreement, their proffered interpretation does not render the indemnification clause meaningless.

*2.  The Parties' Arguments*

We turn now to the merits of this second issue.  The Union asserts that Plaintiffs cannot rely on any exception to the general rule that contractual obligations cease when the CBA ends.  As the Union argues, the agreements themselves, the facts in this case, and general contract principles all support the conclusion that the obligation to indemnify did not survive the expiration of the CBAs.

First, the Union argues that the parties' bargaining history does not support the continued existence of the indemnity obligation after the expiration of the CBAs.  The original 1970 language in section 17.07 limiting Plaintiffs' obligation to the payment of contributions to the Plan is tied to contractual obligations to make contributions, not to any post-agreement liability.  The 1976 changes to section 17.07 "did expand the scope of claims and liabilities subject to indemnification—particularly ERISA-based liabilities," (Doc. 40, Dft.'s Br. in Opp'n to Summ. J. at ECF p. 34), but nothing in the provision expressly provides that the indemnity agreement survives termination of the CBAs.

Rather, the language used, relating to liabilities arising from the Plan's structure and operation, indicates that indemnification would apply to liabilities only arising

during the existence of the CBAs and would have ended when the CBAs terminated. Further, withdrawal liability did not exist in 1976 when this expanded language was added, and no further amendment was made to section 17.07 to specify that the obligation to indemnify continued after termination of the CBAs to recognize passage of the MPPAA in 1980 and its creation of withdrawal liability.

The Union adds that extrinsic evidence supports its interpretation that the indemnity provision was not intended to survive the CBAs' termination. The Union points to Plaintiffs' multiple attempts in January 2013 to add language to section 17.08 that would have provided that the obligation to indemnify survived the termination of the CBAs, language the Union repeatedly rejected. The proposed additional language was: "The rights to receive benefits under the Pension Plan *and the associated responsibilities of the Union as described in the provisions of ARTICLE XVII shall not be affected by the termination of this agreement.*" (Doc. 41, DSMF ¶¶ 110, 111, 113-15, 117, 118, 122, 123) (emphasis added). The Union also argues that Plaintiffs admitted that a fair reading of the proposed language meant that it would have ensured that the indemnity agreement would survive the termination of the CBAs. The Union contends that Plaintiffs' failure to have the proposed language added to the CBAs indicates that the indemnity provision—as currently written in the final CBAs—was not intended to survive the end of those agreements.

The Union further contends that the reason Plaintiffs proffered for the proposed language—that it was meant to reassure their workers that their pension rights would not be affected by the termination of the CBAs—is not plausible. According to the Union, this is because that concern arose from only 3 of approximately 150 employees, and one of those three testified that he was concerned with the growth, not existence, of

his pension if the CBAs ended. The Union also points out that Plaintiffs never tried to reassure their workers in a different manner even after the proposed language did not make it into the CBAs. Finally, Plaintiffs' counsel admitted that the argument could be made that employees could be reassured without the use of the proposed "associated responsibilities" language in the CBAs.

In their reply, Plaintiffs counter that there is no evidence that during the failed negotiations any specific reference was made to the indemnity provision. They also maintain that their motivation behind the proposed language in section 17.08 was to assure their workers that their pension benefits would not be affected by the expiration of the CBAs. Plaintiffs also assert that the Union is simply wrong when it contends that "the associated responsibilities of the Union as described in the provisions of ARTICLE XVII" was a reference to the indemnity provision. Plaintiffs instead argue the Union's most significant responsibility was to ensure "that the structure and operation of the Pension Plan [complied] with all laws applicable to it." (Doc. 43, Pls.' Reply Br. at ECF p. 14).

In any event, Plaintiffs argue that there was nothing in their proposed language that provided any relevant extrinsic evidence demonstrating that the indemnity provision was ambiguous as to withdrawal liability after expiration of the CBAs. Plaintiffs contend we should adhere to our ruling on the motion to dismiss, which they allege found that indemnification for withdrawal liability survives the expiration of the CBAs.

In their supplemental briefing, Plaintiffs also make the following arguments: (1) the facts and occurrences underlying withdrawal liability took place over many years when CBAs were in existence, as evidenced by the statutory scheme for calculating MPPAA withdrawal liability, and just because withdrawal liability was assessed after the

35

expiration of the CBAs does not shield the Union from its contractual duty to indemnify; (2) indemnification, like an agreement to arbitrate, is a remedy that survives expiration of the collective bargaining agreements; and (3) other provisions in the final CBAs, along with Defendants' previous arguments, preclude summary judgment against Plaintiffs.

3. *Expiration of CBA Generally Terminates Parties' Contractual Duties Thereunder*

A "traditional principle" of contract law in regard to a collective bargaining agreement is "that 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" <u>M & G Polymers</u>, 135 S. Ct. at 937 (quoting <u>Litton Fin. Printing Div. v. NLRB</u>, 501 U.S. 190, 207 (1991)). Indeed, "an expired contract by its own terms [has] released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied." <u>Litton</u>, 501 U.S. at 206. As the Sixth Circuit has aptly explained, "Absent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'" <u>Gallo v. Moen Inc.</u>, 813 F.3d 265, 269 (6th Cir. 2016) (citing <u>Litton</u>, 501 U.S. at 207).

Of course, the explicit terms of the agreement itself can also require contractual duties to continue beyond the termination of the agreement. <u>M & G Polymers</u>, 135 S. Ct. at 937 (quoting <u>Litton</u>, 501 U.S. at 207). Exceptions to the general principle that contractual obligations cease when the contract ends "are determined by contract interpretation." <u>Litton</u>, 501 U.S. at 207.

In the instant case, the final CBAs executed by Plaintiffs and the Union begin by stating that they were in effect from "February 16, 2013 to February 15, 2014." (Doc. 36-3, ECF pp. 47, 57, Pl.'s Ex. 17 & 18). Article XX, titled "DURATION," also explicitly

stated in its section 20.01 ("Effective Period, Termination, Renewal"), that the "Agreement shall become effective as of 12:01 a.m. on February 16, 2013, and shall continue in full force and effect until 12:00 midnight on February 15, 2014[.]"  (Id., ECF pp. 54, 64).  The only other durational language in the contract that the parties have identified is section 17.08, titled "Duration of Pension Plan."  (Id., ECF pp. 52-53, 63).  The language in that section, which discusses the rates of required contributions and how modifications to the Plan can be made, also specifically limits its temporal reach to "the term of this Agreement."  (Id.)

Notably, the instant CBAs do not contain what is often referred to as a "survival" clause.  Such a clause can be used to explicitly set forth what duties or obligations—which "might otherwise be extinguished upon termination of the agreement"—survive termination of the contract.  TriState HVAC Equip., LLP v. Big Belly Solar, Inc., 752 F. Supp. 2d 517, 536 (E.D. Pa. 2010).  Survival clauses sometimes set forth a specific length of time an obligation or right survives, and sometimes contain no express time limitation.  See, e.g., Trinity Industries, Inc. v. Greenlease Holding Co., 173 F. Supp. 3d 108, 125 (W.D. Pa. 2016) ("survival" clause in real property "Purchase and Sale Agreement" provided that indemnification "shall survive and continue in force" for three years following closing date); JFE Steel Corp. v. ICI Americas, Inc., 797 F. Supp. 2d 452, 457-58 (D. Del. 2011) (survival clause providing that "indemnities" set forth in relevant article of contract "shall continue in force thereafter in accordance with their terms").

Nor does the instant indemnification provision itself contain survival language.  See, e.g., Crestar Mortg. Corp. v. Peoples Mortg. Co., 818 F. Supp. 816, 817 (E.D. Pa. 1993) ("This indemnity provision shall survive termination of this Agreement.");

Preston Trucking Co. v. Carolina Cas. Ins. Co., 712 F. Supp. 1208, 1213 (W.D. Pa. 1989) ("The indemnity and hold harmless provisions of this paragraph will survive termination of this Agreement.").

In sum, there is no explicit language in the contract to support Plaintiffs' proposition that the Union's contractual duty to indemnify for withdrawal liability extended beyond the expiration of the agreements. Thus, from the language of the CBAs themselves, it appears that the obligation to indemnify is a "creature of the agreement" controlled by the agreement's general durational clause. Cf. 20 Richard A. Lord, Williston on Contracts § 55:27 (4th ed.) ("[R]ights under a collective bargaining agreement that are not vested or accrued are strictly creatures of the agreement, and do not extend beyond the expiration of the contract."); Cincinnati Typographical Union No. 3, Local 14519 v. Gannett Satellite Info. Network, Inc., 17 F.3d 906, 910-11 (6th Cir. 1994). Consequently, for the Union's obligation to indemnify to persist beyond the end of the CBAs, there must be some other contract principle or evidence of intent of the parties that would compel such a conclusion.

### 4. Extrinsic Evidence Regarding Duration of Duty to Indemnify

As noted, the instant indemnification provision is silent as to whether it survives termination of the CBAs or whether it was intended only for the duration of the agreements. To the extent that the language "any claim or liability which may arise by reason of the existence of the Plan" creates an ambiguity regarding the duration of the indemnification clause, both parties argue that extrinsic evidence supports their respective positions. Assuming that this clause is ambiguous and extrinsic evidence is admissible to provide clarification, the weight of that evidence strongly favors the Union's interpretation.

As explained above, the Union has proffered evidence regarding the negotiations leading up to the execution of the final CBAs at issue. During those negotiations, Plaintiffs repeatedly tried to amend Article XVII Section 17.08 to include language stating that "the associated responsibilities of the Union as described in the provisions of ARTICLE XVII shall not be affected by the termination of this agreement." The Union continually rejected the proposed amendment, and it was ultimately abandoned.

Plaintiffs contend that this proposed language was meant to cover not just the duty to indemnify but also other Union responsibilities. Even so, we find such negotiations to be compelling evidence that the final CBAs—as executed by the parties—exhibit an objective intent that the duty to indemnify ceased when the CBAs expired. Indeed, from the proposed amended language, it appears that Plaintiffs were concerned that the language of sections 17.07 and 17.08 as it existed did not evince a clear intent that the Union's contractual obligations extended beyond the CBAs' expiration.

Plaintiffs' argument that other record evidence exhibits an intent to survive expiration is unavailing. Plaintiffs point to, inter alia, the deposition testimony of Mark Taylor, the President of NCP, who testified during his deposition that he believed and intended that the duty to indemnify would survive termination of the CBAs as written. But, as the Union correctly points out, the subjective intentions of the parties not reflected in their objective manifestations are irrelevant. Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 75 (3d Cir. 2011) ("Courts are to consider not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." (citation and internal quotation marks omitted)). It is not surprising that

Plaintiffs' representative would testify—after litigation has commenced—in a manner that would support Plaintiffs' preferred interpretation of the contract. But this post-hoc testimony does not provide an objective manifestation that would aid in ascertaining the parties' intent when they signed the final CBAs. Consequently, such after-the-fact deposition testimony is unpersuasive.

### 5. Contract Law Exceptions to General Rule

Both parties acknowledge that there are certain types of rights and duties that are presumed to survive the expiration of a contract, even without express language to that effect. For example, rights that have vested or accrued over the course of a collective bargaining agreement continue to exist even after the expiration of that agreement. Litton, 501 U.S. at 207. The duty—established by a collective bargaining agreement—to arbitrate disputes that arise under the terms of that agreement will survive the agreement's expiration. Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 252-53 (1977). Also, when an injury or liability arises during the term of a contract, and that contract requires indemnification for such injury or liability, the obligation to indemnify will survive the expiration of the agreement. See Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc., 390 F.3d 336, 340-41 (5th Cir. 2004).

Plaintiffs make a valiant effort to analogize indemnification for withdrawal liability to the types of rights or obligations that are presumed to survive the expiration of a contract. In the end, however, their arguments fall short.

First, Plaintiffs contend that withdrawal liability accrued over the course of many years, as evidenced by the statutory scheme for the calculation of withdrawal liability, see generally 29 U.S.C. § 1391. As Plaintiffs argue, the "facts and occurrences

that are relevant to the assessment of withdrawal liability" took place over many years when CBAs were in existence, as the calculation has a look-back of twenty-five years when computing an employer's proportionate share of the Plan's unfunded vested liabilities—i.e., withdrawal liability.  (Doc. 48, Pl.'s Reply to Suppl. Briefing Order at ECF p. 5).  For Plaintiffs, because the calculation involves the status of the Plan's funding (whether over- or under-funded) over the twenty-five years preceding withdrawal, and the amount of liability for any withdrawal that occurred in 2014 was statutorily fixed as of December 31, 2013, the Union cannot avoid its obligation to indemnify Plaintiffs for withdrawal liability simply because the CBAs expired.

This argument ultimately fails due to the plain language of the statutes at issue.  Although the calculation for withdrawal liability certainly looks back many years preceding withdrawal, the liability itself—that is, the statutory obligation to pay withdrawal liability to the multiemployer plan—does not accrue or "come into existence as an enforceable claim or right"[4] until there is a complete or partial withdrawal from the Plan.  See 29 U.S.C. § 1381(a) ("*If* an employer withdraws from a multiemployer plan . . . *then the employer is liable* to the plan in the amount determined under this part to be the withdrawal liability.") (emphasis added); see also CenTra, Inc. v. Cent. States Se. & Sw. Areas Pension Fund, 578 F.3d 592, 604 (7th Cir. 2009) (explaining that theory that withdrawal liability "accrues over time" has been consistently rejected by various courts (citation omitted)).

As stated above, an employer completely withdraws from a plan when it "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan."  29 U.S.C. § 1383(a).  An "obligation to

_____

[4] *Accrue*, Black's Law Dictionary (10th ed. 2014).

41

contribute," in turn, refers to an obligation arising "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor management relations law." Id. § 1392(a).

Here, Plaintiffs' withdrawal liability only came into existence as an enforceable claim after it completely withdrew from the Plan. That withdrawal came about because NCP and NMP "permanently cease[d] to have an obligation to contribute under the plan" once their collective bargaining agreements expired and the Union disclaimed any interest in representing Plaintiffs' employees. It was those CBAs that had created Plaintiffs' obligation to contribute to the Plan.[5] Notably, although the Union gave notice that it was disclaiming any interest in representing Plaintiffs' employees in a letter dated five days prior to the end of the latest CBAs, the Union specifically indicated that their disclaimer was effective upon expiration of those CBAs. (See Doc. 36-3, ECF pp. 67, 69, Pl.'s Ex. 19 & 20). Thus, while we agree with Plaintiffs that their withdrawal liability "arose and accrued well before they received the [August 18, 2015] letters from the Plan Administrator" assessing withdrawal liability, (Doc. 48, Pl.'s Reply to Suppl. Briefing Order at ECF p. 7), that withdrawal liability accrued—pursuant to the relevant statutory provisions—only after the CBAs expired at midnight on February 15, 2014.

Plaintiffs next argue that indemnification, like an arbitration clause, is a remedy that survives expiration of the collective bargaining agreements. It is true that an

---

[5] The Union points out that NCP and NMP each had a separate "Participation Agreement" with the Pension Plan, and therefore an obligation to contribute to the Plan could have survived the expiration of the CBAs pursuant to the language of the Participation Agreements. (Doc. 49, Def.'s Reply to Suppl. Briefing Order at ECF p. 17; Doc. 41, DSMF ¶ 72; Doc. 41-2, ECF pp. 47-52, Def.'s Ex. 4). However, because the Participation Agreements reflect that Plaintiffs' obligation to contribute could "survive the expiration of the" CBA until a new CBA was signed or until Plaintiffs "withdraw[] from the Plan in complete withdrawal," the expiration of the final CBAs would have triggered complete withdrawal thus simultaneously ending the Participation Agreements' obligation to contribute. (See Doc. 41-2, ECF pp. 48, 51).

arbitration clause in a collective bargaining agreement can survive the expiration of that agreement. But, as Plaintiffs themselves point out, the arbitration provision survives only to "enforce duties arising under the contract." (Doc. 48, Pl.'s Reply to Suppl. Briefing Order at ECF p. 9 (quoting <u>Litton</u>, 501 U.S. at 208)). It would not apply to duties that arose subsequent and unrelated to the agreement containing the arbitration clause.

 In this case, if there were an arbitration clause, such a clause would very likely survive the expiration of the CBAs and compel arbitration of the instant dispute, as the dispute deals with the interpretation of the final CBAs and duties arising thereunder. However, simply because an arbitration clause would survive to settle disputes about duties arising under the contract does not necessarily mean that the obligation to indemnify—the duty itself—also survives. Rather, there would need to be a reason that the indemnification obligation survived the expiration of the contract.

 Here, as explained above, withdrawal liability did not arise or accrue during the term of the final CBAs. Thus, although we agree with Plaintiffs that an indemnification clause, like an arbitration clause, could survive expiration of the agreement, we disagree that the requisite circumstances exist in this case. Rather, in the absence of express survival language, if the obligation to indemnify is to survive the agreement's expiration, the claim or liability for which indemnity is sought must have arisen or accrued during the term of the agreement. <u>See, e.g.</u>, <u>Millennium Petrochemicals, Inc.</u>, 390 F.3d at 340-41.

 In a third argument, Plaintiffs contend that other portions of the CBAs reflect the parties' intent that the obligation to indemnify for withdrawal liability extends past the

CBAs' expiration. In particular, they point to section 2.02 of the final CBAs.[6] This separate indemnification provision requires the Union to indemnify Plaintiffs for "any claim or demand which may be made against the Compan[ies] arising out of the collection of dues and/or initiation fees" that were improperly withheld from an employee's pay. (Doc. 51, Pl.'s Reply to Notice Summ. J. at ECF pp. 12-13). Section 2.02's indemnification provision also does not contain any survival language and is not referenced in a separate survival clause.

This argument suffers from the same infirmity as Plaintiffs' second argument. That is, in order for the obligation to indemnify Plaintiffs for wrongfully withheld dues to survive the expiration of the CBAs, those dues must have been wrongfully withheld during the existence of the CBAs. In other words, the facts and occurrences underlying the claim or liability (wrongfully withheld dues) must have arisen during the term of the agreement. Litton, 501 U.S. at 205-06.

It is true, as Plaintiffs note, that a claim for wrongfully withheld dues might not be asserted until after the expiration of the CBAs. However, in order for the Union to have an obligation to indemnify Plaintiffs for such a post-expiration claim, the claim must

---

[6] Plaintiffs also mention the first sentence in section 17.07 stating that Plaintiffs "shall have no liability for the payment of benefits other than to make contributions to the Plan[.]" (Doc. 51, Pl.'s Reply to Notice Summ. J. at ECF pp. 9-10). However, we have already addressed the lack of relevance of this sentence to withdrawal-liability indemnification. See Section IV. A. 3., supra. To the extent that Plaintiffs rely on the arbitration decision that was affirmed in Shelter Distrib. Inc. v. Gen. Drivers, Warehousemen & Helpers Local Union No. 89, No. 3:05-cv-00138-JDM (W.D. Ky. Mar. 17, 2011), ECF No. 48, we reject this reliance for four reasons: (1) we are not bound by arbitration decisions from other circuits (or this circuit, for that matter); (2) the language of the indemnification provision in Shelter was materially different than the indemnification provision in this case; (3) the arbitration decision finding that indemnification for withdrawal liability survived the expiration of the CBA was only briefly addressed by the district court, which applied the "highly deferential standard of review for an arbitration award under a collective bargaining agreement" set forth in Michigan Family Resources, Inc. v. Service Employees International Union Local 517M, 475 F.3d 746, 753 (6th Cir. 2007); and (4) the Sixth Circuit decision in this case only addressed the issue of first impression regarding whether the indemnification provision was void as against public policy, finding that it was not.

44

have accrued or arisen during the existence of the CBAs.  This makes sense, because to accept Plaintiffs' expansive interpretation would mean that the wrongful-withholding-of-dues indemnification clause would keep the Union on the hook for Plaintiffs' payroll actions in perpetuity.  This is obviously not the objective intent of the one-year CBAs, regardless of whether Plaintiffs subjectively believed it to be so.

Finally, Plaintiffs point out that the Union previously argued that "the ambiguity of the CBA [indemnity] provision precludes determining the parties' intent from the four corners of the document," and that resolving the interpretation of the provision "is dependent on consideration of extrinsic evidence."  (Id. at 14-15 (quoting Doc. 49, Def.'s Reply to Suppl. Briefing Order at ECF p. 6)).  According to Plaintiffs, "[t]o the extent that there were factual issues associated with the parties' intent that allegedly precluded Plaintiffs' motion for summary judgment, the same is true as to granting summary judgment in favor of the Defendants."  (Id. at 15).

We reject this contention for two reasons.  First, just because Defendants previously argued that there were factual issues precluding summary judgment does not mean that we must agree with them after issuing our notice of intent to enter summary judgment in their favor.  As set forth above, even assuming there are ambiguities that permit the introduction of extrinsic evidence, such evidence has been submitted and discussed.  Additionally, to the extent that Defendants argued summary judgment was not proper for Plaintiffs, we agree.  To the extent that they argued that factual issues remain that require resolution by a jury, we disagree.

Second, simply saying "the same is true" as to alleged issues of material fact precluding summary judgment is insufficient to oppose summary judgment.  Plaintiffs are

obligated to point to relevant materials to show that there is a genuine dispute of material fact such that Defendants are not entitled to judgment as a matter of law. FED. R. CIV. P. 56(a), (c)(1). In making this last argument, Plaintiffs point to no such materials, and therefore this argument fails.

Accordingly, we find that no exception to the general rule that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement," is present in the instant case with regard to indemnification for withdrawal liability. M & G Polymers, 135 S. Ct. at 937 (quoting Litton, 501 U.S. at 207). Rather, the obligation to indemnify for withdrawal liability under section 17.07 is controlled by the general durational clause, and thus expired along with the collective bargaining agreements.

*VI.*          *Conclusion*

For the foregoing reasons, we find that the Union had a contractual obligation to indemnify Plaintiffs for MPPAA withdrawal liability. That obligation, however, ended when the Union disclaimed any interest in representing Plaintiffs' employees and, simultaneously, the final CBAs expired at midnight on February 15, 2014. We therefore find that Defendants had no duty to indemnify Plaintiffs for their withdrawal liability that accrued after the expiration of the final CBAs, and thus did not breach those agreements by refusing to indemnify Plaintiffs. Accordingly, we will enter judgment in favor of Defendants and against Plaintiffs on the breach-of-contract claim (Count I) and Plaintiffs' request for declaratory judgment (Count II). An appropriate order will follow.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge